**CHAMPION PARTS, INC.,**
Plaintiff–Appellant,

v.

**OPPENHEIMER & CO.; Daniel J. O'Neill; and Peter A. Russ,**
Defendants–Appellees.

No. 88–2768.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1989.

Decided July 7, 1989.

**1004**

Peter V. Baugher, Schopf & Weiss, Randall L. Mitchell, Paul E. Lehner, Adams, Fox, Adelstein, Rosen & Bell, and Philip Fertik, Beigel & Sandler, Chicago, Ill., for Champion Parts Rebuilders, Inc., an Illinois Corp., plaintiff-appellant.

David L. Carden, Shelley L. Rice, Lee A. Russo, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., Dennis J. Block, Joseph S. Allerhand, and Andrea J. Roth, Weil, Gotshal & Manges, New York City, for Oppenheimer & Co., Inc., a Delaware corp., defendant-appellee.

David L. Passman, Chicago, Ill., for Daniel J. O'Neil and Peter A. Russ, defendants-appellees.

Before BAUER, Chief Judge,
FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

This case involves an attempt by Champion Parts, Inc. ("Champion") to recover from the defendants the money it expended in a successful attempt to obtain equitable relief against a group of investors. The basis of Champion's action against the investors was that the investors failed to file proper disclosures under 15 U.S.C. § 78m(d) (1988) ("§ 13(d)") after they had accumulated greater than 5 percent of Champion's outstanding stock. The district court in the instant action held that Champion has no common law right to the recovery of its litigation expenses and therefore dismissed the action pursuant to Federal Rule of Civil Procedure 12(b)(6). We affirm.

## I.

The facts surrounding the attempt to take control of Champion are set out in detail in Judge Shadur's two opinions in the underlying case, *Champion Parts Rebuilders Inc. v. Cormier*, 650 F.Supp. 87 (N.D.Ill.1986); *Champion Parts Rebuilders Inc. v. Cormier*, 661 F.Supp. 825 (N.D. Ill.1987), and we will only summarize them here.* Defendants Peter Russ and Daniel O'Neill, both registered brokers formerly employed by defendant Oppenheimer, first took interest in Champion when an inhouse analysis identified the company as a good takeover candidate. The company was considered a good takeover candidate because it was thought to own a significant amount of undervalued real estate; so much so that the breakup value of the company was believed to be greater than its market price. Russ and O'Neill discussed their interest in the company with their superiors at Oppenheimer, including Michael Metz, an Oppenheimer Senior Vice President, who apparently agreed with their assessment of Champion.

Russ and O'Neill developed a plan to take control of Champion. The plan called for Russ and O'Neill to contact their customers and persuade them to obtain suffi-

---

* As this case comes to us as an appeal from the grant of a motion to dismiss, we must accept all of the opposing party's factual allegations as true and take them in the light most favorable to that party. *Harris v. Brock*, 835 F.2d 1190, 1193 (7th Cir.1987).

cient shares of Champion to enable them to demand the resignation of Champion's board of directors. A new board would then be elected to carry out the other elements of Russ' and O'Neill's plan, which entailed: "cleaning up" Champion's balance sheet; eliminating excess capacity; and, within two years, selling the company to the highest bidder. Russ and O'Neill were successful in arousing interest among their clients and, without ever publicly disclosing their true intentions, began to purchase large amounts of Champion stock on behalf of various clients and groups of clients (collectively, the "group"). So as to avoid calling attention to themselves, and risk the possibility of an increase in Champion's stock price, the brokers used practices such as "side-by-side buying," where the brokers bid for shares seriatim rather than simultaneously in order to avoid bidding up the price, and "stock parking," where shares of stock are held by someone other than the true owner for the purpose of lowering the apparent amount of stock owned by that person, to effectuate their purchases.

By October 1987, the group, without ever filing an accurate disclosure pursuant to § 13(d), had accumulated 42% of the outstanding shares of Champion stock. A meeting with Champion's Chief Executive Officer was then arranged at which time the group finally disclosed the extent of its control of Champion stock and requested that all current board members resign.

Champion responded to the group's demand with the underlying litigation before Judge Shadur. In that litigation Champion successfully argued for a temporary injunction and other equitable relief against the group on the grounds that the group had violated § 13(d) by failing to disclose its actual intentions with regard to Champion after it had accumulated greater than 5% of Champion's outstanding shares. The litigation was eventually concluded pursuant to the entry of an Agreed Final Judgment Order. Champion claims that it expended in excess of one million dollars in pursuing the litigation and has brought this suit in an attempt to recover those expenditures from the defendants.

Champion's complaint sets out five separate theories under which it claims it is entitled to recover damages, in the form of its litigation expenses, from the defendants: tortious inducement of illegal conduct (Count I); tortious interference with Champion's protectible interest in an informed market for its shares of stock (Count II); tortious conspiracy (Count III); negligent failure to supervise and *respondeat superior* (Count IV); and, finally, violations of both the Illinois Consumer Fraud and Deceptive Business Practices Act and the New York Consumer Protection from Deceptive Acts and Practices Act (Count V).

The district court granted the defendants' motion to dismiss for failure to state a claim upon which relief could be granted on all of these claims. The court held that because money damages are unavailable in an action under § 13(d), Champion, by obtaining the injunction and other equitable relief it sought, had "received all that it was entitled to in the § 13(d) litigation." The court thus dismissed the instant action as an effort by Champion to "enlarge its Section 13(d) relief ... under the guise of" various common law torts.

The district court, although it did not state its decision in these terms, apparently reasoned that a damages award to Champion in this situation would alter the balance struck by the Williams Act between incumbent management and bidders in their pursuit of shareholder support and would thus be pre-empted as violating the Supremacy Clause. An argument, although not one forwarded by Oppenheimer, can be fashioned to support that reasoning. The argument would start with the proposition, accepted by a plurality of the Supreme Court in *Edgar v. Mite*, 457 U.S. 624, 634, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982), that the Williams Act was intended solely to provide information to investors and was not meant to alter the balance between incumbent management and bidders. The argument would then state that the unavailability of damages to an issuer in an action brought under § 13(d) was part of the delicate balance struck by the Williams

Act. To allow an issuer to receive damages under state law based on the violation of § 13(d), the argument would conclude, would tip the balance in favor of target corporations and would thus violate the Supremacy Clause.

We can perceive several potential problems with this argument. Initially, it is unclear whether adding to the costs of a tender offer will always alter the balance between targets and bidders in a way that will create a conflict with the Williams Act. *See CTS v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 1646 n. 7, 95 L.Ed.2d 67 (1987). Second, it may be difficult to reconcile this argument with § 28(a) of the Securities Exchange Act (the "Act") which states, in part, that the rights and remedies of the Act "shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 78bb(a) (1982). For an extended discussion of these and other problems with pre-emption arguments based on the Williams Act, see *Amanda Acquisition Corporation v. Universal Foods Corporation,* 877 F.2d 496, 502–505 (7th Cir.1989).

Fortunately, we need not resolve the question of whether this state law damages action is pre-empted by the Williams Act. For even if Champion's damages claim is not pre-empted by the Williams Act, the district court was still correct to dismiss the action.

## II.

Champion alleges that it is entitled to recover from the defendants (collectively "Oppenheimer") the attorney's fees it expended in prosecuting the § 13(d) action in federal court. As jurisdiction of this action is based on diversity of citizenship, we must look to Illinois state law to evaluate this claim. Illinois generally recognizes the American Rule in distributing the burden of attorney's fees. That rule holds that absent a statute or contractual provision, a successful litigant must bear the burden of his or her own attorney's fees. *Ritter v. Ritter,* 381 Ill. 549, 46 N.E.2d 41, 43 (1943); *Kerns v. Engelke,* 76 Ill.2d 154, 28 Ill.Dec. 500, 506, 390 N.E.2d 859, 865

(1979). Were that rule without exception this case would be over since everyone agrees that no contract exists between the parties and no statute provides for fee shifting in this situation and thus Champion, even as a successful litigant, would have to bear its own litigation expenses.

Illinois does recognize an exception to the rule, however, and Champion claims this case fits within that exception. In Illinois:

> where the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expenses to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorney fees.

*Ritter,* 46 N.E.2d at 44. The theory behind the exception is that a tortfeasor should be held responsible for all of the natural and proximate consequences of his actions. *Sorenson v. Fio Rito,* 90 Ill.App.3d 368, 45 Ill.Dec. 714, 719, 413 N.E.2d 47, 52 (1980). If one consequence of the tortfeasor's actions is to involve a person in litigation with others, the expenses incurred in that litigation are held to be damages no less compensible than any other element of damage resulting from the tort. It is clear from the Illinois cases, however, that the exception does not remove the plaintiff's obligation to show that he or she has a cause of action against the defendant; the exception only adds an element of damages to that preexisting cause of action. *See National Wrecking Co. v. Coleman,* 139 Ill. App.3d 979, 94 Ill.Dec. 287, 290, 487 N.E.2d 1164, 1167 (1985) (defendant tortiously interfered with contract between plaintiff and third party); *Nalivaika v. Murphy,* 120 Ill.App.3d 773, 76 Ill.Dec. 341, 342, 458 N.E.2d 995, 996 (1983) (defendant fraudulently misrepresented status of real estate sold to plaintiff resulting in suit against plaintiff by third party); *Sorenson,* 413 N.E.2d at 52 (negligence of defendant forced plaintiff to expend money on attorney's fees). Thus, to receive damages pursuant to the exception, Champion must

show that its expenditures were the natural consequence of a tortious act by Oppenheimer against Champion.

Champion claims that Oppenheimer was guilty of four different torts under Illinois law: inducing a breach of statutory rights; interference with Champion's protectible interest in a stable market for its shares; conspiracy; and *respondeat superior* and failure to supervise. Unfortunately for Champion, it cannot state a cause of action for any of these alleged torts and therefore the district court was correct to dismiss this case.

### A.

■ Count I of Champion's complaint alleges that Oppenheimer induced the group to violate the statutory rights of Champion's shareholders to disclosure under § 13(d). According to Champion, such inducement amounts to a tort under Illinois common law and is actionable in a suit maintained by the issuer which, in this case, is Champion.

Illinois has never recognized a tort of inducing a violation of statutory rights. The most analogous actions that have been recognized in Illinois are the torts of interference with contractual relations and interference with prospective economic advantage. *See Belden Corporation v. InterNorth, Inc.*, 90 Ill.App.3d 547, 45 Ill. Dec. 765, 413 N.E.2d 98 (1980) (interference with contractual relations); *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 16 Ill.App.3d 709, 306 N.E.2d 549 (1974) (interference with prospective economic advantage). To be successful in those actions, a plaintiff must prove, among other things, that *it* had a valid and enforceable contract, *Belden*, 413 N.E.2d at 101; *Zagar v. Field Enterprises Educational Corporation*, 58 Ill.App.3d 750, 16 Ill.Dec. 122, 124, 374 N.E.2d 897, 899 (1978) (no cause of action stated for interference with contractual relationship where no contract existed), or that *it* had a reasonable expectancy of entering into a valid business arrangement. *Tom Olesker's Exciting World*, 306 N.E.2d at 553. Similarly, the only reported case from any

jurisdiction which recognizes the tort of inducing a violation of statutory rights, *Flamm v. Bethlehem Steel Company*, 18 Misc.2d 154, 185 N.Y.S.2d 136, 137–38 (Sup. Ct.1959), required that *plaintiffs* be deprived of their statutory rights in order to state a cause of action.

In this case, Champion has *no* statutory rights under § 13(d); the right to receive the information contained in a § 13(d) disclosure belongs not to Champion but to its shareholders. *Indiana National Corporation v. Rich*, 712 F.2d 1180, 1185 (7th Cir. 1983); *Dan River, Inc. v. Unitex Limited*, 624 F.2d 1216, 1222 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981). Champion was permitted to maintain the underlying injunction action only to vindicate the rights of its shareholders. *See Indiana National Corp.*, 712 F.2d at 1185 ("corporation's standing to sue under Section 13(d) is representational"). Thus, an essential element of the interference torts on which Champion relies for analogy is missing in this case; Champion has no rights of its own to protect and cannot maintain an action for interference with non-existent rights. The district court was correct to dismiss Count I.

### B.

■ In Count II of its complaint Champion alleges that Oppenheimer interfered with its protectible interest in an informed market for its shares. The market for its shares was disrupted, Champion claims, when the group failed to make the disclosures required by § 13(d). The unstable market, in turn, "interfered with Champion's ability to raise equity capital and find investment bankers willing to manage the placement of its shares."

Again, the tort alleged by Champion, interference with an informed and stable market for shares of stock, has not yet been recognized by any Illinois court and thus the company attempts to analogize the circumstances of this case to the interference torts which have been recognized by Illinois. However, Champion is no more successful in establishing any protectible

interest in this Count than it was in Count I.

Champion claims that it has a protectible interest in a stable and informed market for its shares of stock. No case has been cited to us, and our independent research has failed to disclose any case, which holds that an issuer has a property interest in the market for its shares of stock. Indeed, the case law is uniform that Champion has no interest in the shares of its stock in the marketplace. *See, e.g., Golden Nugget, Inc. v. American Stock Exchange, Inc.,* 828 F.2d 586, 590–91 (9th Cir.1987). Nevertheless, Champion argues that there is a distinction between the market for its shares, in which it claims to have an interest, and the shares in the hands of its shareholders, as to which it disclaims any interest. Champion correctly observes that it has some interest in the market for its shares since it may choose to raise capital through a future issue of shares. We believe, however, that that interest is too speculative to give Champion any *protectible* interest in the market for its shares. To the extent there is a common law right to a stable and informed market for shares of stock, and we doubt there is such an animal, that right belongs to shareholders, not to an issuer. The district court was correct to dismiss Count II of Champion's complaint.

### C.

■ Count III of Champion's complaint alleges that Oppenheimer violated the tort of conspiracy. It is well settled in Illinois that "conspiracy does not of itself constitute an actionable wrong...." *Galinski v. Kessler,* 134 Ill.App.3d 602, 89 Ill.Dec. 433, 436, 480 N.E.2d 1176, 1179 (1985). Instead, conspiracy becomes actionable only when the underlying conduct which is the subject of the conspiracy is independently tortious. *Id.* As discussed above, Champion has alleged no conduct on the part of Oppenheimer which constitutes a tort under Illinois law and, therefore, Count III was correctly dismissed.

### D.

■ Count IV of Champion's complaint contains two different theories of tort liability. The first, *respondeat superior,* was correctly dismissed by the district court for the same reason the conspiracy count was dismissed. A company can be liable under the doctrine of *respondeat superior* only where it can be shown that its employee engaged in tortious (or wilful, malicious or criminal) conduct. *Rubin v. Yellow Cab Co.,* 154 Ill.App.3d 336, 107 Ill.Dec. 450, 451, 507 N.E.2d 114, 115 (1987). As discussed above, Russ and O'Neill did not commit a tort against Champion and thus Oppenheimer cannot be held liable under *respondeat superior.*

■ The second theory of tort liability contained in Count IV is that Oppenheimer negligently failed to supervise its employees. To state a cause of action in Illinois for negligent failure to supervise, a plaintiff must show that the employer owed some duty to the plaintiff. *Id.* 107 Ill.Dec. at 452, 507 N.E.2d at 116. In this case Oppenheimer owed no duty to Champion; Oppenheimer, to the extent it owed anyone a duty of supervision, owed that duty only to its customers. Thus, Count IV was also correctly dismissed.

### III.

■ Finally, Champion claims that it is entitled to damages because the actions of Oppenheimer violated both the Illinois Consumer Fraud and Business Practices Act and the New York Consumer Protection from Deceptive Acts and Practices Act. The unfair and deceptive practices of which Champion complains include, among other unstated actions, the stock parking and parallel buying employed by Russ and O'Neill in gathering Champion stock. Although its allegations are extremely vague, Champion apparently claims that it has standing to bring an action because it suffered some form of competitive injury as a result of Oppenheimer's activities.

The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Act") is designed to protect consumers,

borrowers and businessmen from "deceptive acts or practices in the conduct of any trade or commerce." Ill.Rev.Stat. ch. 121½ (1973). The act has been interpreted to permit business competitors to sue to redress competitive injuries they suffer as a result of deceptive practices by other businesses. *Newman–Green, Inc. v. Alfonzo–Larrain,* 590 F.Supp. 1083, 1087 (N.D.Ill. 1984). Assuming that the plaintiff and defendant businesses do in fact compete, the plaintiff competitor, to maintain such an action under the Illinois Act, must show that the practices of the defendant are of the type which *affect* consumers generally. *Id.; Jay Foods, Inc. v. Frito–Lay, Inc.,* 664 F.Supp. 364 (N.D.Ill.1987), *aff'd,* 860 F.2d 1082 (7th Cir.1988); *Century Uni. Enterprises v. Triana Development,* 158 Ill. App.3d 182, 110 Ill.Dec. 229, 239, 510 N.E. 2d 1260, 1270 (1987); *Beaton & Associates v. Joslyn Mfg. & Supply,* 159 Ill.App.3d 834, 111 Ill.Dec. 649, 656, 512 N.E.2d 1286, 1293 (1987). The business competitors may also have to show that the public was *injured* by the deceptive practices, but this appears to be an open question. *Newman–Green,* 590 F.Supp. at 1087. Although we believe that most of the cases which hold that public injury is not required are distinguishable, since they do not involve business plaintiffs alleging a competitive injury, *see, e.g., Duncavage v. Allen,* 147 Ill. App.3d 88, 100 Ill.Dec. 455, 463, 497 N.E.2d 433, 441 (1986), we need not decide the issue to dispose of this case.

Oppenheimer's deceptive practices, "parking" and "side-by-side buying," are practices which affect consumers generally. The practices affect the market by withholding information about a possible change in control of a company. In fact, the whole idea behind the practices Oppenheimer allegedly engaged in is to deceive the market.

Still, Champion could not have suffered a competitive injury as a result of the deceptive practices because it was *not* a competitor of Oppenheimer with regard to the market that was affected by Oppenheimer's deceptive practices, *i.e.* the stock market. It would make no sense to permit a noncompetitor to sue for damages under a

theory of competitive injury and we do not believe Illinois has done so. Thus, Champion cannot maintain an action under the Illinois Act.

Champion also claims that Oppenheimer's actions violated New York's Consumer Protection from Deceptive Acts and Practices Act (the "New York Act"). The New York Act prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN.BUS. § 349 (McKinney 1984). Unlike the Illinois Act, no New York court, nor any federal court sitting in diversity, has interpreted this section of the New York act to permit business competitors to sue based on a claim of competitive injury. Indeed, the courts have limited standing to sue under the New York Act to "consumers," whether they be businesses or individuals. *Azby Brokerage, Inc. v. Allstate Insurance Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988); *Genesco Entertainment v. Koch,* 593 F.Supp. 743, 751–52 (S.D.N.Y.1984). Champion does not bring this action as a corporate consumer and therefore cannot state a claim under the New York Act.

IV.

For the reasons discussed above, the district court was correct to dismiss Champion's complaint and, therefore, the court's decision is AFFIRMED.